United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRITTANY KEENE, individually and on behalf of others similarly situated,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>COLDWATER CREEK, INC., a Delaware corporation, and DOES 1 through 100, inclusive,<br><br>　　　　Defendants.<br>　　　　　　　　　　　　　　　　　／ | No. C 07-05324 WHA<br><br>**ORDER GRANTING FINAL APPROVAL OF CLASS SETTLEMENT AND AWARDING FEES AND COSTS** |

**INTRODUCTION**

In this action for violations of the California Labor Code, the parties seek final approval of a class-action settlement. After an initial settlement proposal was rejected as unfair to class members, the parties restructured the proposal to, among other changes, improve the plan of notice and increase the minimum payment to the class. The Court preliminarily approved the settlement thereafter. Plaintiff now moves for final approval of the settlement agreement. For the reasons stated below, the motion for final approval of the restructured settlement is **GRANTED**.

**STATEMENT**

Plaintiff Brittany Keene alleges that defendant Coldwater Creek, a company that operates women's clothing and accessory stores and spas, violated her rights under the California Labor Code. Plaintiff contends that defendant denied her and other non-exempt

1  hourly employees meal breaks and rest periods, failed to compensate her and other similarly
2  situated employees for "off the clock" work, and failed to provide required compensation to
3  laid-off employees, among other violations. Plaintiff filed this action in Alameda County
4  Superior Court, and in October 2007 the case was removed to federal court. Plaintiff filed a
5  first amended complaint several months later.

6  In August 2008, the parties reached a proposed class settlement and plaintiff moved for
7  preliminary approval of the settlement agreement. The proposal involved a *maximum* gross
8  settlement fund of $950,000. Class members who timely submitted claim forms were to receive
9  *minimum* compensation calculated as fifty percent of the "gross settlement consideration," *i.e.*,
10 the settlement fund reduced by attorney's fees, payments to the state for the Private Attorneys'
11 General Act claims, and administration costs, among other matters. Under this formula, the
12 *minimum* payout was estimated to be just over $280,000. The compensation of each individual
13 class member would be calibrated to the number of shifts worked. *Those who failed*
14 *affirmatively to opt out of the class would have their rights pertaining to the claims in this*
15 *action extinguished, whether or not they submitted claim forms*. The initial proposal also
16 included a side payment to the named plaintiff.

17 A hearing on the motion was held September 18, 2008, at which the Court expressed
18 concerns with the proposed settlement. The Court directed the parties to meet and confer
19 regarding those concerns. On September 26, 2008, the parties filed a joint memorandum with a
20 revised settlement proposal. The revised proposal addressed some, but not all, of the concerns
21 identified by the Court at the hearing. It eliminated the side payment to the named plaintiff;
22 increased the minimum payout available to the class to approximately $350,000; and improved
23 the notice plan in various respects including through personal delivery of the notice forms to
24 potential class members who remain employed by defendant (Dkt. No. 49).

25 In an October 2008 order, the Court declined to approve the revised proposal. Again,
26 the settlement was unfair to absent class members. The order stated that, although the latest
27 proposal was improved, the Court still had concerns about the adequacy of notice to absent
28 class members. The parties had declined to adopt the Court's suggestion to deem opted out of

1  the agreement potential class members whose notice forms were returned as undeliverable and,
2  for current employees, those who had not acknowledged personal delivery of the notice
3  (Dkt. No. 50).

4  In November 2008, the parties submitted another revised proposal. A November 19
5  order explained that the parties had addressed the bulk of the Court's concerns, with two
6  exceptions relating to the form of notice. As directed, the parties filed another revised class
7  settlement agreement that addressed those matters. A December 2008 order preliminarily
8  approved the restructured settlement. The parties now move for final approval of the
9  settlement, and a hearing on the motion was held June 10, 2009.

## ANALYSIS

11 At the hearing, the Court indicated that response rates to the class notice were
12 troublingly low — just thirty-two percent of the potential class of 3,150 submitted claim forms;
13 an additional five percent opted out; two percent were deemed opted out; no one objected; but
14 over sixty percent entirely failed to respond. The problem is that these class members who
15 failed to respond will have their rights pertaining to the claims in this action erased completely
16 with no compensation. This is a substantial concern. The Court has considered the possibility
17 of insisting on a claims-made settlement, meaning that no rights would be waived unless a class
18 member submitted a claim form.

19 Plaintiff's counsel seeks to justify the outcome because, in counsel's experience, there
20 usually is a low response rate. Counsel also explained at the hearing that those class members
21 who had worked a greater number of shifts — and therefore stood to receive a larger
22 recovery — had submitted claims at a greater rate. At the hearing, the Court requested
23 supplemental briefing to determine the extent of the problem. On June 15, the parties submitted
24 a joint report in response to the Court's questions.

25 The supplemental filing indicates that the picture is not quite as troubling as it initially
26 appeared. *First*, although just thirty-two percent of *class members* had submitted claims, those
27 with larger claims had in fact responded at a higher rate. When considered by the *value* of
28 potential claims, the response rate was forty-six percent. *Second*, a significant portion of the

3

1  class members who failed to respond had worked a minimal number of shifts and thus stood to
2  receive relatively small recoveries. Specifically, fifty-five percent of those who failed to
3  respond had worked three months or less, and thirty-one percent had worked one month or less.
4  As a general matter, the clear trend was that, the larger the claim, the higher the response rate.
5  *Finally*, the response rates for current employees (who, at the Court's insistence, had received
6  hand-delivered claim forms and signed personal acknowledgments of receipt thereof) roughly
7  mirrored overall response rates. Specifically, thirty-two percent of current employees filed
8  claim forms; eleven percent opted out; and fifty-seven percent failed to respond. This is a
9  slightly better record. For these reasons, final approval of the settlement is hereby **GRANTED**.

*        *        *

11  Plaintiff's counsel requests an award of attorney's fees of $232,000. This request is far
12  out of proportion to the actual benefit conferred on the class. This amount represents twenty-
13  five percent of the *maximum theoretical* gross settlement of $950,000 reduced by the claims of
14  those class members deemed opted out — *i.e.*, twenty-five percent of $928,881.86. The
15  $950,000 "maximum" figure has always been illusory. The actual maximum settlement
16  amount, however, was instead closer to $350,000. As counsel himself stated, the class response
17  rate was, as a foreseeable matter, likely to be low. The actual payout to class members under
18  the proposal will only be $337,409.26. This includes $7,500 to be distributed to the class on a
19  *pro rata* basis under the Private Attorney General's Act, but not the penalty payments of
20  $22,500 that will go to the California Labor & Workforce Development Agency under PAGA.
21  Nor does this total include litigation costs or class-administration costs — the settlement
22  proposal includes an additional $51,177.99 for the costs of settlement administration, and
23  Counsel requests litigation costs of $14,905.04 (Cooper Decl. ¶¶ 5, 23; Paul Decl. ¶¶ 14, 19).
24  The true benefit to the class is the $337,409.26, *i.e.*, the guaranteed minimum. Without
25  the Court's intervention, the minimum guarantee would have been even lower, all with class
26  counsel's acquiescence. At the time the proposal was first proffered, the Court recognized that
27  the theoretical maximum was highly unlikely to even come into play (since it assumed a large
28  claims rate, which almost never happens) and that the true value turned on the guaranteed

4

minimum, which is why the Court insisted on a higher guaranteed minimum and sent counsel back to the drawing board.

The Court will award fees of $112,469.75 — twenty-five percent of an amount equal to the benefit conferred on the class grossed up by the amount of the attorney's fee award. The Court acknowledges that this fee award will "leave some money on the table" in the sense that defendant has agreed to pay attorney's fees over and above this amount. That, however, is not the test. A key consideration should be reasonableness in light of the benefits actually conferred. To award more would encourage collusion designed to feather the nest of the attorneys at the expense of a low-end settlement for the class. This is a low-end settlement for the class, barely deserving of Rule 23 approval, and class counsel will be adequately compensated for this effort.

## CONCLUSION

For all of the above-stated reasons, the motion for final approval of the class settlement is **GRANTED**. Plaintiff is awarded attorney's fees of $112,469.75. Counsel requests costs of litigation of $14,905.04. That request is granted. Finally, the settlement includes costs of settlement administration of $51,177.99, and the above-described payments under PAGA. Those amounts are also approved.

**IT IS SO ORDERED.**

Dated: June 23, 2009.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

5